In the United States District Court
Western District of Virginia
Danville Division

Anthony Burtt,
Plaintiff,

v. Civil Action No.

Ford Motor Company

AND

Barkhouser Motors, Inc.,

AND

James Barkhouser,

AND

Benjamin Powell, Jr.
Defendants.

# <u>**Amended**</u> ***Complaint***

INTRODUCTION

1. This action is brought pursuant to the laws of the United States and Virginia and arises out of Defendant Ford's failure to comply with its warranty obligations in the replacement of a lemon, and its agents' fraud in trying to bilk Plaintiff as a part of Ford's replacement process.

**Jurisdiction**

2. Jurisdiction of this court arises under the under the Magnuson Moss Warranty Act 15 U.S.C. 2310(d)(3)(B), and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

## PARTIES

3. Plaintiff Anthony Burtt is a resident of Danville, Virginia.

4. Defendant Ford Motor Company is a corporation whose registered agent is CT Corporation System Registered Agent for Ford Motor Company, Inc. 4710 Cox Rd., Ste. 301 Glen Allen, Va. 23060-6802.

5. Defendant Barkhouser Motors, Inc. is a corporation whose address is 3604 Riverside Dr., Danville Va. 24541. Barkhouser was Ford's agent and servant for the replacement of the lemon, acting within the scope of its employment.

6. Defendant James Barkhouser is the dealer operator of Barkhouser Motors, Inc. and an agent, employee, and servant thereof, acting within the scope of his employment. James Barkhouser approved, ratified, and condoned the deceptions herein.

7. Defendant Benjamin Powell is a sales manager and an employee, agent and servant of Barkhouser, acting within the scope of his employment. He perpetrated the deceptions herein.

8. At all times after May 22, 2007, Barkhouser and its agents and servants were acting as the agents and servants of Ford, within the scope of their employment.

## FACTS

9. On or about February 22, 2007, Burtt purchased a 2007 F-250 Crew Cab diesel long bed pickup truck from Barkhouser Motors for personal, family, or household purposes, and used it primarily for those purposes. At the time, the truck had but 45 miles on it. Burtt purchased the long bed because he was going to buy a fifth wheel travel trailer, and hauling it with a short bed truck will damage the short bed of the short bed truck because the bed is too short. The truck cost $50,575.54.

10. Ford offered a limited factory warranty on the car, the terms of which are more particularly found in its warranty publication.

11. Ford is engaged in the business of manufacturing automobiles which it sells through its various factory authorized sales and service outlets, franchises and agents. Ford represents to the general public that each and every one of the vehicles it manufactures is constructed of sound material and in a good and workmanlike manner, is free from defects, that its vehicles are safe and fit for the purpose for which they are used and designed, to wit, to drive upon the public highways. Ford also warrants that it will conform any part found defective to that representation.

12. In its Warranty Information booklet, Ford requires that only authorized ford dealers may perform warranty service.

13. Almost immediately, the truck began to malfunction.

14. The truck malfunctioned in that the engine would spontaneously cease to function while at highways speeds. When the engine quit, Burtt would lose power steering and brakes, and control of the truck. This happened the first time when the truck had only 1400 miles on it.

14a. At about 1400 miles, the engine spontaneously stopped running without notice on Rt. 86 south while Burtt was going to Caswell Pines Golf Course. This was the first time. Burtt called Barkhouser they said it must be a fluke but to bring it in and they would look at it. When he took it to them, they came out and looked at it but never even pulled it in garage. They just drove it down the road and said it was fine.

When the mileage was between 1400 -2000, when Burtt went to West Virginia, the engine spontaneously stopped twice while running going down I-81. Burtt called Barkhouser, who said they would have to look at it when I got back in town. When Burtt got back to Danville, Barkhouser looked at truck, and said they would have to see when it was actually not running to troubleshoot it.

When the mileage was between 2000-2600 on a trip to Charlotte, NC, the engine spontaneously stopped running, but started right back up. On a golf trip to Myrtle Beach the engine spontaneously stopped running coming back.

On or about April 23, 2007, when the mileage was between 2600-3100 Burtt took a trailer with an antique car in it to Lynchburg, Va. for a friend to have body work done to it. The truck's engine the engine spontaneously stopped running when he was leaving body shop towing the empty trailer. He called Apple Ford which was within 5 miles but it started before the tow truck arrived so Burtt drove it to them. They put a computer on

it and said that it needed to be updated, and they reprogrammed the electronic control module. Burtt was under the impression that all was fixed. Between the time the mileage was 3100 until May 20th 2007when Burtt took a trailer to Hancock MD to install e-track in it, but never made it. The engine spontaneously stopped running on the way. Burtt brought truck to Barkhouser the following workday.

15. By May 20, 2007, Burtt had presented the defective truck to an authorized Ford Dealerships, including Barkhouser, at least four times. Each time, the authorized Ford dealers claimed they could find nothing wrong with it.

16. On or about May 20, 2007, Burtt was pulling a 28 foot trailer with the truck. The engine spontaneously quit, causing Burtt to lose his power brakes and power steering at the same time. Using only the trailer brake, Burtt attempted to stop but ran off the road, causing approximately $2500 in damage to his trailer. He was after a while able to start the truck and went very carefully home.

17. The next day, Burtt contacted Barkhouser Motors, who advised him to bring the truck to their authorized Ford dealership. Burtt delivered the truck to Barkhouser Motors.

18. On or about May 22, 2007, Powel called Burtt, and informed him that the truck was unsafe to drive, and that Ford would replace it. Barkhouser Motors gave Burtt a used Ford Taurus to drive as courtesy transportation. The 2007 will hereinafter be referred to as “The Deathtrap.”

19. On or about June 6, 2007, Ford sent James Barkhouser a document entitled "Reacquired Vehicle Transaction Procedures," thus making Barkhouser Motors, Inc. its agent and servant for purposes of the Burtt matter. Barkhouser Motors would be paid $400.00 for handling the repurchase for Ford. Ford also sent its written confirmation of its repurchase offer to James Barkhouser and/or Barkhouser Motors, who never informed Burtt of its existence, though it was addressed to Burtt.

20. Powell claimed that it attempted to find a 2007 F 250 Crew Cab diesel, but none were to be found in the whole of the United States. As of the date of this Complaint, there are ten of these on Ebay. Powell informed Burtt that he would have to replace his 2007 with a 2008, and pay the difference between year models. However, Ford would pay the $2500.00 for the damage to the trailer. Burtt did not really want a 2008, as it had a 6.4 liter diesel, an engine of a brand new design, and 2008 was the first year in production. This engine was already plagued with defects.

21. On or about June 4, 2007, Powell represented to Burtt that Barkhouser Motors had ordered for him a white 2008 F-250 Crew Cab diesel long bed pickup truck, and that it would be at Barkhouser by June30 or July 5, 2007. The timing was important to Burtt, as he was selling his house and would soon need a truck to haul a trailer containing his family's belongings.

22. Powell represented to Burtt that Barkhouser and Ford were going to swap the Deathtrap title for the white 2008 title so that Burtt would enjoy the low interest rate from

the Deathtrap purchase. Powell also represented to Burtt that Ford would pay Burtt for the trailer damage, the bed liner that Burtt had put in the Deathtrap, transfer of the expensive stereo Burtt had in the Deathtrap, and would replace an extra keyless entry that Burtt had with the Deathtrap.

23. On or about June 11, 2007, Powell informed Burtt that he would have to pay about $5300 to upgrade to a 2008. Burtt was unhappy, as he did not want to pay an extra $5300 for a <u>2008 truck, as the engines in the 2008s were already notoriously defective.</u> Burtt asked Barkhouser to have the Ford representative contact him about this.

24. A few days later, Powell contacted Burtt and informed him that Ford would not pay for the trailer damage. Powell suggested that Burtt make a claim on his insurance. Burtt refused, as this would cause his insurance rates to increase for five years because of Ford's defective deathtrap truck. Powell would get back to him.

25. A few days later, Powell contacted Burtt and informed him that Ford would not do anything concerning the trailer damage, but that Barkhouser Motors would take care of the $2500.00. Burtt pointed out that the Ford representative had not contacted him about the $5300.00.

26. On or about July 1, 2007, Burtt contacted Barkhouser Motors asking whether the 2008 had arrived. Debbie, a Barkhouser Motors employee replied that Powell had lied to Burtt about the June 30 arrival, as that truck would not be in for another month to

month and a half. The employee asked Burtt not to mention this latter to Barkhouser Motors, as he would get fired for telling the truth to Burtt.

27. Burtt immediately went to Barkhouser. Burtt told Powell that he needed the truck because he was selling his house and needed the new truck to move. Powell told Burtt that the new truck would absolutely, positively be in by July 5th.

28. On July 5th, Powell called and informed Burtt that the truck had not come in, and they had no idea why.

29. On or about July 10, Powell called and told Burt that his truck was built, but the Norfolk, Virginia plant was on a two week shutdown for July 4th, and that his truck had been sitting there waiting for shipment since June 30. It would absolutely, positively be in by July 12. Burtt remonstrated, as he was under the impression that crew cab F250s came from a plant in Kentucky. Powell said no, his was built in Norfolk, Virginia. Burtt told Powell that he needed the truck to move and that he needed the truck to pull his 5th wheel travel trailer, which he and his family would be living in pending the building of his new house.

30. In fact, the Norfolk Ford Plant ceased production on June 28, 2007. In fact, the Norfolk plant only F 150s, not the F250 that Burtt had ordered, and could not make the larger cab models, one of which Burtt had ordered. In fact, the last vehicle to leave the Norfolk plant on June 28, 2007 was a ***<u>2007</u>*** red F150.

31. Powell told Burtt that he could come down to the lot and pick out a diesel on the lot and use as courtesy transportation in place of the aurus  until the paperwork was done for the allegedly ordered white 2008. Barkhouser claimed they had a red one that was identical (except for cab lights) to the white one ordered. When Burt arrived, he found that the red truck was not in fact identical, but was a short bed.  Burtt objected, on the grounds that his 5th wheel might damage it. Powell instructed Burtt to install a slider hitch instead of a standard hitch, and assured him that with the slider hitch, the 5th wheel would not damage the short bed truck. Having only 11 days to move his family and all of their belongings, Burt took the red truck, and turned in the Taurus.  At no time did Barkhouser reveal that it considered Burt's taking of this truck as an agreement to buy it, and at no time did Burt agree to buy the red truck.

32. Pursuant to its scheme to sell the red truck to Burtt instead of the white one it led him to believe he would buy, Barkhouser illegally issued him a temporary certificate of registration.  Pursuant to Va. Code Sec. 46.2-1542, a temporary certificate of registration may only be issued by a motor vehicle dealer when he sells or conditionally sells  a motor vehicle. Also pursuant to that section, A copy of the temporary registration certificate AND ***a bona fide buyer's order shall be delivered to the purchaser and shall be in the possession of the purchaser at all times when operating the vehicle.*** If these two things are done, then a purchaser may insure the vehicle temporarily.  Tim White, employee of Barkhouser Motors,  represented that Barkhouser Motors would contact Burtt's insurance agent and put the red truck on Burtt's insurance.

33. Barkhouser did not generate a buyer's order for the red truck, nor did Burtt sign one, as he never agreed to buy the red truck. Barkhouser concealed the fact that a Buyer's Order was required for Burtt to insure the truck, and that it would consider his insuring thereof as agreeing to buy it, and had Burtt insure the truck based on the temporary registration, which is dated July 10, 2007.

34. Later that day, Burtt called his insurance agent to verify that Powell had insured the truck. Barkhouser had never called, so Burtt put the truck on his insurance.

35. On July 11, 2007, Burtt had the Benji-Powell-suggested slider hitch put in for his fifth wheel, at a cost of $1000, and despite Powell's assurances, slightly damaged the bed of truck with the 5th wheel, causing approximately $600.00 worth of damage to the bed. He contacted Powell to report the damage, and was told by Powell NOT to have it fixed, that Barkhouser could do it with paintless dent removal. Barkhouser wanted to do paintless removal, as if they had to paint the truck, it would be used, and not be sold as new, nor at a new price. To prevent further damage to the red truck, Burtt had a bed liner put in it at a cost of $616.00.

36. On or about July 25, 2007, Burtt called Ford Credit, to whom he was making payments, and explained the situation. Ford's records already showed that the Deathtrap would be replaced by the ***RED*** truck. Burtt objected, saying that no, the Deathtrap would be replaced by the white truck he had ordered. Ford Credit did not know anything about

any white truck ordered. They referred Burtt to the customer service division. Burtt began to smell a rat.

37. On August 10, 2007, Powell called Burtt and asked him to come to Barkhouser Motors and "sign the papers." Thinking that "papers" finally meant the ones for the white truck Burtt had ordered, Burtt agreed to come, but was not signing anything because the $5300.00 issue had not been cleared up. Barkhouser replied that he had to sign the papers for the ***red*** truck or have nothing to drive, as the temporary tags expired at midnight. Burtt had never agreed to buy the red truck verbally or in writing, seen any Buyers Order, nor other written agreement to buy the red truck, and of course refused to sign anything to buy a truck without knowing the essential terms of the agreement, such as price, trade in allowance, and interest rate.

38. Burtt went to Barkhouser Motors and told Powell he was not signing the papers for the red truck. Powell suggested that Burtt turn in the red truck and drive a loaner Taurus until it was all figured out. Burt agreed. Concerning the $2500.00, Powell told Burtt that Barkhouser would not in fact take care of it, and that Burtt should turn it in on his insurance, and if Burtt's agent was advising him not to, it really meant that the insurance agent was a crook and that the agent had never actually put insurance on Burtt's trailer. Powell suggested that Burtt contact attorney Brian Turpin about the crooked insurance agent.

39. By this time, Burt had been making monthly payments of over $700.00 per month on a truck Barkhouser had taken away from because it was unsafe on May 22, about four months earlier. Burtt had signed no papers whatsoever concerning the red truck except the temporary certificate for the 30 day tags.

40. On or about August 11, 2007 Burtt contacted Powell to let him know that he was contacting an attorney, and that he had an appointment with Elmer Woodard. Powell groaned, and told Burtt that he should not contact Elmer Woodard, because Elmer Woodard was a joke, a crook, a sleaze, and Barkhouser's "enemy."

41. On or about August 11, 2007, Burtt consulted Elmer Woodard despite Powell's "advice," and then went to Barkhouser to with the red truck to try to resolve the matter. He asked that Powell contact the Ford representative. Powell guaranteed that Ford would call Burtt the next day before noon, and gave Burt the phone number.

42. When he did not call, Burtt contacted Powell. Powell told Burtt that he would not talk to him, because Burtt was suing them, and "This was going to get nasty." Powell claimed that though he had not seen it, he had heard that Ford had received a fax that morning that Barkhouser was being sued by Burtt, and that Powell could not help Burt any more, and Powell's "hands were tied." Burtt told them that he was not in fact suing them but had only consulted an attorney, and all that he wanted was the white truck that had been ordered, along the lines that Powell had set forth (see paragraph 13), and left.

43. About an hour later, Powell then called Burt and claimed that James Barkhouser had required Powell to get the Taurus back from Burtt, because Burtt was suing them.

43a. <u>On or about August 14, 2007, at approximately 0600 hours, after Barkhouser had taken away the Taurus, Burtt's wife had a flat tire way out on the Danville Bypass. She called Burtt crying, who was unable to help because he had no means of transportation. Burt had to contact his brother to pick him up, and then go out to help his wife with the flat tire.</u>

<u>43b. On or about August 16, 2007, Burt effected cover by purchasing a 2001 4 wheel drive F250 Crew Cab diesel long bed for approximately $16,500.</u>

44. On or about August 18, 2007, Burt contacted Ford Credit again and spoke to Crystal. Crystal said she would call Barkhouser and get to the bottom of it.

45. When she did not call back, Burtt called Ford Credit again and spoke to Kristi. Kristi told Burtt that Crystal did not call back because she, Crystal had contacted Barkhouser and Barkhouser had claimed Burtt was suing them. As it turns out, Kristi was the one who had handled the paperwork for the repurchase back in May. She vowed to call Barkhouser and get to the bottom of it, and call Burtt back.

46. When she did not call back, Burtt called Ford Credit again and spoke to Katrina Jolley. She referred Burtt to Joey in customer resolution. Joey vowed to get to call Barkhouser to get to the bottom of it and call Burt back.

47. When he did not call back, Burtt called Katrina Jolley again, who referred him to her supervisor, Kiesha. Kiesha agreed to postpone all future due dates of Burtt's payments.

48. On or about September 5, 2007, Barkhouser, by counsel, made demand that Burtt sign the papers to buy the red short bed truck. Barkhouser took the position that because Burt had signed the temporary registration, insured the truck, installed a hitch, installed a bedliner, and driven it for 30 days, Burtt had "made representations" that he would buy the red truck. Though the price of, trade in allowance for, nor interest rate on the red truck had yet to ever be mentioned, if Burtt did not contractually obligate himself to buy it on the terms Barkhouser dictated by September 10, Barkhouser would sue him for, *inter alia*:

-$7,508.00 for replacement and painting of the front bumper, damage to the bed, removal of the bedliner, and removal of the sliding hitch, and other alleged damage;

-$2,000 depreciation due to the mileage Burtt put on the truck

-$1500.00 depreciation associated with "future disclosure of repairs."

49. Counsel also demanded that Burtt remove the Deathtrap from Barkhouser's lot, or be charged $15.00 per day after September 11, 2007.

50. Counsel also pointed out that if Burtt wanted to arrange to get the Deathtrap, Burtt would need to go to the Barkhouser lot and "contact" (grovel) before James Barkhouser personally. Counsel did include a copy of Ford's written offer to resolve a consumer dispute of June 6, 2007 that James Barkhouser received but never transmitted

to Burtt. Counsel also affirmatively represented that Barkhouser Motors had "requested" the prestigious firm of Clement & Wheatley to "enforce" the claim, and included in its letter the validation notice required under the Fair Debt Collection Practices Act. A copy of this letter was sent to James Barkhouser.

51. In fact, Barkhouser's allowing Burtt to use the red truck as courtesy transportation changed its nature from a new truck to a used one, thereby diminishing its value by approximately 35%. Barkhouser could no longer sell the red truck as new, but could only sell it as used. Pursuant to Va. Code Sec. 46.2-1571D, Barkhouser would also have to disclose the damage from the 5th wheel trailer hitch , and therefore would be forced to sell the truck at a loss.

52. Rather than eat this loss, Barkhouser, repurchase agent and servant of Ford, chose to force Burtt to pay an unknown price for the red truck. It did so by manipulating his transportation, a process commonly known as "dehorsing," because the easiest way to force someone to buy a new horse is to take away his old one. Barkhouser first took the Deathtrap and put Burtt in a Taurus that did not meet Burtt's needs, all the while claiming that it had ordered a truck for him. When the ordered truck did not arrive, and Burtt may have bought a truck from someone else, Barkhouser put him in the red truck.[1] Barkhouser the required Burtt to sign a paper agreeing to buy the red truck if he wanted to drive it beyond the 30 day registration. When Burtt refused to fall into this trap, Barkhouser demanded the red truck back, and gave Burtt another taste of the Taurus.

[1] Allowing someone to drive a vehicle for a few days is a dealer practice called "puppy dogging," as once someone holds puppy dog, they get attached to it and buy it. Car dealers do the same thing, which is why they are always so hot to go on a test drive.

When Burtt still refused to buy the red truck, Barkhouser took the Taurus away from him. When he still refused to buy the red truck, Barkhouser threatened to sue him for their alleged losses because he did NOT buy the red truck.

53. On or about September 6, 2007, Burtt, by counsel, responded that he would "not be taking advantage of Barkhouser's continuing efforts to screw him."

54. After at least three repair attempts, Ford's authorized service representatives were unable to cure the defects.

55. On or about September 6, 2007, Burtt gave notice to Ford and to Barkhouser that the Deathtrap was a lemon, and also revoked his acceptance of the Deathtrap, sending notice thereof to both.

56. At all times pertinent hereto, this transaction was covered by the Virginia Motor Vehicle Warranty Enforcement Act, Va. Code Sec. 59.1-207.11 et seq., and by the Magnuson Moss Warranty Act, by the Virginia Consumer Protection Act, and by the Fair Debt Collection Practices Act.

56a. On or about September 9, 2007 Burtt took pictures of the red truck. As of that date, Barkhouser had not apparently repaired any of the $7508.00 worth of alleged damage.








OFF ROAD


56b. As of January 31, 2007 Burtt has paid approximately $1000.00 in interest on the truck.   Burtt has paid approximately six months insurance on the Deathtrap and Barkhouser's substitute offerings at approximately $120.00 per month, has paid about $321 in personal property taxes on it.  Burtt has suffered damaged in the amount of about $1200 for reinstalling accessories,  approximately $16.500 in cover damages for a replacement 2001 F250 4Wheel Drive Crew Cab Diesel; has lost $616.00 for the bedliner in the Deathtrap and another $616.00 for the bedliner in the Red truck; has lost approximately $1,000 for the Benji-Powell-suggested trailer hitch.

Burtt has lost approximately $ 5,250 in lost wages, and he had lost the use of his truck for 254 days. Smaller pickup trucks rent for about $68.00 per day in Danville, without gooseneck trailer towing capacity, and so Burtt has lost the use of his truck in the minimum amount of $17,242.00 as of that date,  Burtt has also stored the Deathtrap since May 22, about 240 days, which at Barkhouser's threatened daily rate of $15.00 per day amounts to $3780.00 as of that date.  Burtt has suffered approximately $16,000 in aggravation, humiliation, inconvenience and embarrassment damages ($8,000 per120 days out of use); and is entitled at minimum to prejudgment interest at the rate of 9.58 per day  ($50,000 @7% /365) for 254 days ($2,435.61).   [Paragraph Total 66,680.61]

56c.  Burtt has also suffered additional damage in that Ford Motor Credit has now declared him n default, threatened to repossess the Deathtrap in violation of their earlier

agreement and  violation of Burtt's revocation of acceptance rights, and has adversely affected his credit so much that Burtt is either ineligible for credit or will have to pay a higher interest rate.

COUNT I
Violation of the Lemon Law
(Ford)

57. The Deathtrap is a motor vehicle as defined by Va. Code Sec. 59.1-207(11).

58. Ford warranted that the Deathtrap was free from defects, and that if any defects were found within the warranty period, Ford would rectify.

59. Fords, its agents and/or authorized dealers, did not conform the Deathtrap to its applicable warranties by remedying or correcting the defects or conditions after a reasonable number of attempts to do so.

60. The Deathtrap was out of service due to repair for a cumulative total of more than thirty calendar days during the lemon law rights period.

61. No wars, invasions, strikes, fires, floods or other natural disasters affected the repairs attempted on this RV.

62. Pursuant to Va. Code Sec.  59.1-207(14), Burtt may recover their damages from Ford, which include, but are not limited to, the purchase price of the car, all interest paid to the date of judgment, any insurance premiums paid, and any other incidental and consequential damages, in excess of $10,000, to be more particularly proved at trial, plus reasonable attorneys fees and costs.

COUNT II
Violation of the Magnuson Moss Warranty Act
(Ford)

63. The Deathtrap is a consumer product, as that term is defined in § 2301(1) of Magnuson-Moss, and was manufactured after July 4, 1975.

64. Fords is a warrantor, as that term is defined in § 2301(5) of Magnuson-Moss.

65. Burtt is a consumers, as that term is defined in § 2301(3) of Magnuson-Moss.

66. Burtt gave Ford a reasonable opportunity, on several occasions, as described above, to cure its failure to comply with its warranties, yet Ford did not cure.

67. Burtt has been damaged in that the value of the Deathtrap as delivered is substantially less than the value of the Deathtrap as warranted.

68. Pursuant to 16 U.S.C. 2310(d)(1), Plaintiffs may recover of Ford their damages, costs, and attorneys fees.

COUNT III
Breach of Warranty
(Ford)

69. In its warranty, Ford expressly warranted that it would repair certain defects.

70. Pursuant thereto, Burtt accepted delivery of the Deathtrap on the reasonable assumption that any defects would be cured.

71. Ford has failed and refused to seasonably cure the defect, despite ample opportunity to do so.

72. Additionally and alternatively, Ford's warranties contained exclusive remedies. Those remedies have failed of their essential purpose.

73. Burtt revoked his acceptance of the Deathtrap within a reasonable time after discovery of the grounds therefor and before any substantial change in condition of the coach.

74. Pursuant to UCC Sec. 2-608, Burtt has all rights granted to them as if they had initially rejected the Deathtrap.

75. Pursuant to UCC-2-711(3), Burt has a security interest in the Deathtrap to the extent of his payments on the price and any expenses reasonably incurred as provided by that statute.

76. Burtt asserts that the value of the Deathtrap with the defects and history of defects is effectively nothing, and asserts that he has been damaged to the extent of the value of his payment obligations on the Deathtrap.

77. Burt has also incurred incidental and consequential damages, including, but not limited to, costs of insurance, decals, and the like.

## COUNT IV
## Consumer Fraud
## (Ford, Barkhouser Motors Inc., Benji Powell, James Barkhouser)

78. Plaintiff realleges and incorporates herein the allegations above.

79. Ford, by its agent and servant Barkhouser Motors, Inc., by its agents and servants James Barkhouser, and Benji Powell, committed unfair or deceptive acts or practices in violation of the VCPA, including but not limited to one or more of the following:

a) using deception in connection with a consumer transaction, in violation of Virginia Code § 59.1-200, in that they misrepresented the terms of the repurchase of the Deathtrap, in an attempt to force Burtt to buy their red truck instead of the white one.

b) misrepresenting the source, sponsorship, approval and certification of the terms of the replacement services for the Deathtrap as Ford's terms in violation of Va. Code Sec. 59.1-200(2);

c) offering the white truck for sale with intent not to sell at the price or upon the terms advertised, in violation of Va. Code Sec. 59.1-200(8).

d) entering into a written agreement with a consumer to resolve a dispute that arises in connection with a consumer transaction, and the failing to adhere to the terms and conditions of such an agreement, in violation of Virginia Code § 59.1-200(17).

80. Defendants willfully and intentionally committed the above unfair or deceptive acts or practices.

81. For each intentional or willful violation of the Consumer Protection Act as well as the misrepresentations and concealments described herein, Plaintiff is entitled to recover triple the actual damages, or $1,000.00, whichever is greater, and reasonable attorney fees and court costs, pursuant to Virginia Code §59.1-204. In the alternative, for each unintentional violation, Plaintiff is entitled to recover actual damages, or $500.00, whichever is greater, and reasonable attorney's fees and court costs, pursuant to §59.1-204.

COUNT V
Actual Fraud

(Ford, Barkhouser Motors Inc., Benji Powell James Barkhouser)

81a. Plaintiff realleges and incorporates herein the allegations above.

82. In representing that it would replace the Deathtrap with the white truck, Ford, by its agent and servant Barkhouser, by its agents and servants Benji Powell and James Barkhouser, these Defendants made false representations of fact as to the terms of the repurchase upon which they knew or should have known that Burtt would rely.

83. In concealing its actual terms of the repurchase, that it was for the red truck only, these defendants concealed material facts upon which they knew or should have known that Burtt would rely.

84. At the time these Defendants promised to sell Burtt the white truck, they had they had no intention of performing that promise.

85. At the time these Defendants gave Burtt possession of the red truck, these defendants had no intention of replacing with the white truck.

86. The representations were material and false and made with full knowledge of their falsity or with reckless disregard of the truth.

87. These Defendants intended Burtt to rely on the representations and concealments of the repurchase terms.

88. Burtt justifiably relied on the false representations and concealments. The representation that the white truck was ordered and would arrive soon played a material and substantial part in leading Plaintiff to purchase the white truck and to put up with these Defendants' actions. As a result of said misrepresentations, Burtt drove an unacceptable Taurus for two months, had to rush to move, damaged the red truck because of Barkhouser's false representations about the hitch, and could not haul his trailers for a four month period.

89. The false representations and bogus promises were made willfully, recklessly, maliciously or with intent to injure and defraud Burtt.

90. These Defendant knowingly and intentionally made the misrepresentations and bogus promises with the intent to mislead Plaintiffs in an effort to induce Plaintiffs to purchase the red truck and with the intent Plaintiff would act upon those misrepresentations.

91. These Defendants' conduct and actions as described herein constitute a conscious disregard for federal law, state law, and the rights of Plaintiff; Defendants' calculated and deliberate misrepresentations constitute misconduct entitling Plaintiff to an award of punitive damages, attorneys' fees and costs in this matter.

92. As a direct and proximate result of the foregoing, Plaintiff suffered substantial damages and losses and foreseeable incidental and consequential damages including but not limited to the diminished value of the vehicle, finance charges, insurance costs and property taxes, and other damages and Plaintiff incurred attorney's fees, costs and expenses in prosecuting this action and related injury and inconvenience.

WHEREFORE, Burtt ask that this Court award relief as follows;

COUNT I: judgment as stated above, plus reasonable attorneys fees, and costs;

COUNT II: judgment as stated above, plus reasonable attorneys fees and costs;

COUNT III: judgment as stated above, plus reasonable attorneys fees;

COUNT IV: judgment as set forth above, plus treble damages, costs and attorneys fees;

COUNT V: judgment as set forth as above, plus punitive damages and attorneys fees;

COUNT VI: judgment as set forth above, plus reasonable attorneys fees.

and such other and further relief as to justice may seem meet.

A JURY TRIAL IS DEMANDED

Anthony Burtt

Elmer Woodard
Attorney at Law, P.C.
VSB 27734
105 S. Union St. Ste. 600
Danville, Va. 24541
434-793-0400
isuecrooks@verizon.net